IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2012

## LESLIE RAYDELL JONES v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County**
**No. 12117      Robert Crigler, Judge**

**No. M2011-01128-CCA-R3-PC - Filed May 30, 2012**

The petitioner, Leslie Raydell Jones, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing he received the ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Andrew Jackson Dearing, III, Assistant Public Defender, for the appellant, Leslie Raydell Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Charles Frank Crawford, Jr., District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The petitioner was convicted by a Bedford County Circuit Court jury of premeditated first degree murder and especially aggravated burglary and sentenced to a term of life plus twelve years imprisonment. State v. Leslie Raydell Jones, No. M2006-01829-CCA-R3-CD, 2007 WL 4224638, at *1 (Tenn. Crim. App. Nov. 30, 2007). On his first direct appeal, this court concluded that there was no error with respect to the petitioner's allegations that the evidence was insufficient to sustain his convictions and that his convictions were based on the perjured testimony of several witnesses. Id. However, this court also concluded that the petitioner's conviction for especially aggravated burglary should be modified to reflect a

conviction for aggravated burglary because an especially aggravated burglary conviction was precluded by Tennessee Code Annotated section 39-14-404(d). Id.

On remand, the trial court imposed a sentence of six years on the aggravated burglary conviction. State v. Leslie Raydell Jones, Jr., No. M2008-01887-CCA-R3-CD, 2009 WL 2151831, at *1 (Tenn. Crim. App. July 20, 2009). The petitioner appealed again, arguing that the trial court erred in applying the "exceptional cruelty" enhancement factor, but this court affirmed the sentencing decision of the trial court. Id.

The underlying facts of the petitioner's case were recited by this court on the petitioner's original direct appeal as follows:

Officer Cody King of the Shelbyville Police Department testified that he was dispatched to the Bedford Manor Apartments in the early morning hours of December 16, 2004 to investigate a reported shooting. Upon arrival, a man and woman informed him that someone inside the apartments had been shot. When entering the victim's apartment door, Officer King noticed that the door had a footprint on it and was unlocked. Officer King secured the scene by checking to make sure no one else was in the apartment before attending to the victim. He described the victim, Terry Lynn Alford, as slumped over on the couch with a small knife in his hand. Officer King described the knife as a collector type and noted that an open display case was found on a table near the entry to the apartment.

John Riddle, a paramedic with the Bedford County Emergency Medical Services, testified that he was called to the victim's apartment on December 16, 2004 in response to a reported gunshot wound. He stated that the victim was not breathing and did not have a pulse upon his arrival at the scene. All efforts to resuscitate the victim were unsuccessful.

Jennifer Leann Nowlin, the [petitioner]'s girlfriend at the time of the incident, testified that she knew the victim as a friend of her mother. She recalled that her sister, Samantha, also lived in the Bedford Manor Apartments in December 2004. She stated that she and the [petitioner] had spent December 15 "getting high" at her mother's home. She said that the victim called the [petitioner] at her mother's home and, after the two talked, the [petitioner] told her that they needed to go see the victim. She recalled that Jennifer Ellington drove them to the victim's apartment. She testified that the [petitioner] told her to deliver "some stuff" to the victim while the [petitioner] stayed in Samantha's apartment. She acknowledged that she delivered "crack

-2-

or . . . something else of the sort" to the victim. The [petitioner] instructed Nowlin to retrieve twenty dollars from the victim in exchange for the "stuff." She stated that the victim gave her a one hundred dollar bill and that she told him she would bring his change back to him later.

Instead of immediately returning with change, Nowlin went back to her mother's house with the [petitioner] and Ellington. Soon thereafter, the victim telephoned and threatened Nowlin's life if she did not bring him his money. The victim persisted in his phone calls even after Nowlin hung up on him until eventually, the [petitioner] spoke with the victim. Afterwards, the [petitioner] indicated that he would go talk to the victim about the situation but that he needed to talk to his cousin, Darian Mays, first. Nowlin testified that the [petitioner] left her mother's home with Lynette Noteboom. The two returned with Darian Mays, and then all three left again. She said that the [petitioner], Mays and Noteboom had been gone a while when she received a phone call from her sister, Samantha, reporting that something had happened at the apartment complex. When the [petitioner] returned to her mother's house, he told Nowlin that he would be leaving for a few days. Nowlin spoke with the [petitioner] later and he told her that "he did something really wrong." On cross-examination, Nowlin acknowledged that she never saw the [petitioner] and the victim together on December 15 or 16 and that she never heard an altercation between them. She also stated that the victim's front door was unlocked when she delivered the drugs to him earlier that evening.

Lynnette Noteboom testified that Jennifer Ellington is a friend and that she came to Nowlin's mother's home in search of Ellington on December 15. She arrived at around 9:30 and visited with Nowlin, Ellington, the [petitioner], Nowlin's mother, and Nowlin's mother's boyfriend before leaving to pick up her son at the Bedford Manor Apartments to take him to work. After taking him to work, she returned to Nowlin's mother's house but found only Nowlin's mother and her boyfriend at the house. She recalled that the [petitioner], Ellington and Nowlin returned to the house. She also remembered that the [petitioner] talked on the phone with someone and that he seemed "a little agitated." Noteboom reported that the [petitioner] asked for a ride, so she took him to pick up Mays and returned to Nowlin's residence again. Once again, the [petitioner] telephoned someone and appeared upset and agitated. The [petitioner] asked Noteboom for a ride to the Bedford Manor Apartments, so she drove the [petitioner] and Mays to the apartments.

At the apartments, the [petitioner] instructed Noteboom to park in the

-3-

back and to wait on him and Mays. Noteboom stated that she waited for about five minutes when both men returned to the car "moving pretty quick." Neither the [petitioner] nor Mays mentioned what had happened in the apartment. Noteboom returned Mays to his apartment before she and the [petitioner] returned to Nowlin's residence. She described the [petitioner] as "cool as a cucumber" and reported that she never saw anyone with a gun. She recalled that Samantha Nowlin telephoned Jennifer Nowlin to tell her that something had happened at the Bedford Manor Apartments but that she "never thought it was from when [she] was out there with [the [petitioner] and Mays]." Noteboom testified that she later identified the [petitioner] and Mays as the two individuals she drove to the apartment complex that night.

Samantha Nowlin testified that she was living at the Bedford Manor Apartments on December 15, 2004. She stated that her apartment was across the hall and upstairs from the victim's apartment. Samantha Nowlin stated that her sister, Jennifer, was dating the [petitioner] in December 2004. She recalled that the [petitioner] came to her apartment to use the telephone on the evening of December 15. Later that evening, the victim stopped Nowlin outside the apartment and asked her for her mother's phone number. Sometime after midnight, as she was playing monopoly with her boyfriend and cousin, Nowlin testified that she heard some loud banging downstairs. Nowlin looked outside because she thought it could be the ex-husband of her friend and downstairs neighbor, Brandeise Collins, banging on a door. She could not tell which specific downstairs apartment the noise was coming from until she heard the victim say "I didn't do anything, man" in a scared voice. She recalled that Mays looked up at her from the stairway landing so she went back inside her apartment. Although she could not see another person downstairs with Mays, she could hear another individual. She recalled that her cousin, Laura Walden, took several steps further down the stairway that night than she had.

Samantha Nowlin testified that when she returned to her apartment, a downstairs neighbor, Brandeise Collins, telephoned her and asked her was what going on. She then heard the victim say "Oh, my God" followed by a gunshot. After she heard the gunshot, she called 911. After going downstairs, she could see through the slightly opened door of the victim's apartment that the victim was slumped over and had a gunshot wound to his left side. The police arrived soon thereafter, so she returned to her apartment to telephone her sister to report that the victim had been shot. Samantha Nowlin testified that she identified Mays from a photographic lineup as the person she saw

-4-

near the victim's door that night immediately before she heard the gunshot. She reiterated that she also heard another individual speaking to the victim at that time.

Laura Walden testified that she was at Samantha Nowlin's apartment on the night of December 15, 2004. Her testimony was consistent with that of Samantha Nowlin. Additionally, she said that when she took several steps down the stairway, she saw the [petitioner] at the victim's door. On cross-examination, she admitted that she did not identify the [petitioner] in her initial statement to the police taken on December 16. On redirect, she explained that she did not identify the [petitioner] or Mays because she was scared.

Brandeise Collins testified that she was living across the hall from the victim at the time of the incident. She testified that she was on the telephone with Samantha Nowlin trying to figure out what was going on when she heard the victim yell that he had not done anything followed by a gunshot. She soon heard someone exiting the building and tried to look out the window but could not see anyone outside.

Jennifer Brooke Ellington testified that in December 2004 she had known the [petitioner] about six months. She recalled being with the [petitioner] and Jennifer Nowlin at Nowlin's residence on December 15, 2004. She stated that the three of them spent most of the day together and left several times in her vehicle. Her testimony regarding the evening visit to Bedford Manor Apartments and telephone calls at Nowlin's residence was consistent with the testimony of the other witnesses. Ellington further testified that the [petitioner] appeared angry after talking to the victim on the telephone. Her testimony regarding the [petitioner] and Noteboom's activities with Mays was consistent with that of other witnesses as well. She testified that she left with the [petitioner] to stay at a home of one of his relatives after the [petitioner] returned from the apartments the last time that evening. When the police apprehended the [petitioner] several weeks later, Ellington was with him and she told the police that he was not at the residence as she was instructed to do by the [petitioner]. On cross-examination, Ellington admitted that she had been convicted of giving false information to the police for her attempt to protect the [petitioner] from apprehension.

Darian Mays testified that the [petitioner] is his cousin. He stated that the [petitioner] telephoned him on the evening of December 15, 2004 and that

later that night, the [petitioner] and a girl named Lynn picked him up at a friend's apartment. They went to "some girl's house" in the country. He recalled that the [petitioner] spoke to someone on the telephone and described that he talked in a normal voice, but that he was "cussing." After the telephone call ended, Mays stated that Lynn said "'come on, let's go,'" so Mays left with the [petitioner] and Lynn. The three of them went to Bedford Manor Apartments where Lynn parked in the back. Mays testified that when the [petitioner] kicked in a door to an apartment, Mays ran up the steps. Soon thereafter Mays heard a gunshot so he "took off running." Mays ran to Lynn's vehicle with the [petitioner] arriving at the vehicle within seconds or a minute later. Mays and the [petitioner] did not talk about anything that happened in the apartment building. Mays testified that he told the [petitioner] to drop him off at home. Mays stated that he never saw the [petitioner] with a gun that night and that he did not know the victim. He also acknowledged that he was charged with his involvement in the incident but that the warrants had not yet been served, that he was presently incarcerated on unrelated drug charges, and that he had not been promised anything in exchange for his testimony. He reiterated that the state had only asked him "[t]o tell the truth."

Linda Fleming Zimmerman testified that she was the victim's next door neighbor at the time of the offenses. She recalled that the victim arrived home around 5:00 p.m. on the evening of December 15, 2004. Nothing unusual occurred until later that night at about 1:30 a.m. on December 16. She heard a loud bang and walked to the peephole of her door to investigate the sound. She saw two men standing in the hallway and partially in the victim's doorway. One man was short and the other individual, who was in the victim's doorway, was taller. She heard the victim say that he had not done anything and saw the muzzle flash of a gun held by the taller man. The two men immediately left through the main door to the building. She went into the hallway and stood with Samantha Nowlin and another neighbor in the victim's doorway until the police arrived.

Detective Lori Mallard of the Shelbyville Police Department testified that she took statements from several witnesses on the night of the incident. Several weeks later, she prepared a photographic lineup that was shown to Samantha Nowlin who identified Mays as one of the perpetrators. Lynette Noteboom was shown a separate photographic lineup and identified the [petitioner] and Mays as the two individuals she drove to the Bedford Manor apartments that night. Detective Mallard also participated in the [petitioner]'s apprehension where she observed the [petitioner] trying to escape through a

window from the residence. Detective Mallard collected several pairs of the [petitioner]'s shoes for processing by the Tennessee Bureau of Investigation Crime Laboratory. She also noted that the [petitioner] was taller than Mays.

Detective Brian Crews of the Shelbyville Police Department testified that the investigation of the victim's homicide focused on the [petitioner] and Mays after interviewing Samantha and Jennifer Nowlin and Lynnette Noteboom. Detective Crews recounted the [petitioner]'s apprehension and Jennifer Ellington's attempts to conceal the [petitioner]'s presence at the residence where he was found. He stated that the [petitioner] surrendered in the face of the heavily armed police officers present at the scene. Detective Crews also took Mays' statement and denied that anyone from the state had promised Mays leniency in exchange for his testimony.

Assistant Medical Examiner Thomas Deering testified that he performed the autopsy of the victim and determined that the victim died from multiple gunshot wounds to his left arm and abdomen that resulted in extensive internal damage to the victim's aorta and inferior vena cava. Doctor Deering concluded that the victim ultimately bled to death from his internal injuries. The toxicology screen of the victim also revealed the presence of Valium and cocaine.

Leslie Raydell Jones, 2007 WL 4224638, at *1-5.

The petitioner evidently filed a petition for writ of error coram nobis on January 28, 2008, in which he apparently argued that the trial court was without jurisdiction to sentence him.[1] On July 20, 2010, the petitioner filed a petition for post-conviction relief, arguing that the trial court was without jurisdiction to sentence him, his convictions violated the protection against double jeopardy, and he received the ineffective assistance of counsel. Counsel was appointed and filed two amended petitions, detailing various allegations of ineffective assistance of counsel.

The post-conviction court conducted an evidentiary hearing, at the outset of which the post-conviction court denied an outstanding motion by the petitioner for the court's recusal. The petitioner then testified that counsel represented him at trial and on appeal, and that he only spoke with counsel two to four times prior to trial. Each meeting lasted about an hour. He admitted that counsel provided him with a copy of the discovery response

---

[1] The petition for writ of error coram nobis was not included in the record before us, but the petitioner relayed this information in his petition for post-conviction relief.

received from the State under Tennessee Rule of Criminal Procedure 16.  He asked counsel to investigate and interview witnesses listed in the discovery response, specifically Jennifer Nowlin, Samantha Nowlin, Michael Hicks, and one or two others.  Counsel told the petitioner that he tried to speak with Michael Hicks, but "Hicks wouldn't cooperate."  When the petitioner asked counsel if he had spoken with any of the other witnesses, counsel said that "they wouldn't talk to him."

The petitioner testified that he asked counsel to visit the crime scene, but, to his knowledge, counsel did not do so.  The investigator hired by counsel visited the petitioner and showed him pictures of a place that was not the crime scene.  The petitioner said that he was never asked about his drug addiction, aside from his and counsel's discussions regarding the night of the murder and what the witnesses had said about them "smoking blunts with crack on the blunts."

The petitioner testified that he was shown several witness statements, but he did not discover until after Darian Mays testified that Mays had made a written statement that contradicted Mays's audio-taped statement.  He said that he asked counsel to file motions to suppress his shoes, coat, and the door to the victim's apartment, but counsel did not file such motions.

The petitioner also complained about counsel's preparation for his appeal.  The petitioner felt that the transcript of the trial was incomplete because the instructions to the jury were not transcribed into the record, even though the record did contain "what the trial judge read from when he charged the jury."  The petitioner believed that the appellate brief written by counsel was inadequate because of the incomplete transcript.

The petitioner summed up that he believed counsel was ineffective because he did not investigate the crime scene, did not get Darian Mays's written statement, and did not apprise him of what some of the witnesses were going to say at trial.

On cross-examination, the petitioner admitted that counsel obtained funds from the court to hire an investigator to assist in trial preparation, and he met with the investigator once or twice leading up to trial in addition to his meetings with counsel.  With regard to his claim of a drug problem, the petitioner opined that his addiction should have been obvious to counsel because of their discussions about the petitioner "get[ting] high."

The petitioner acknowledged that counsel cross-examined Darian Mays at trial regarding matters discussed in Mays's audio-taped statement and in the written statement that they did not receive until trial.  Specifically, Mays was cross-examined about a claim in his written statement that the district attorney had made him promises for his testimony.

With regard to his contention that he wanted counsel to seek suppression of the door to the victim's apartment and his pairs of shoes, the petitioner acknowledged that the Tennessee Bureau of Investigation determined that none of his shoes matched the print on the victim's door. As to his claim regarding the suppression of his coat, the petitioner admitted that no one identified, at trial, his coat as being worn by one of the perpetrators.

The petitioner elaborated, with regard to his allegation concerning the jury instructions, that he was not able to tell whether the trial court said something different than what was in the written charge because the reading of the charge was not transcribed. However, the petitioner acknowledged that the court gave each party a written copy to read along as the court read the instructions into the record but said that he did not "read along because [he] knew [he] would have a transcript to compare it to[.]" The petitioner did not recall either party informing the trial court that it had read something incorrectly.

Counsel testified that he had been licensed to practice law for fourteen years and devoted his practice exclusively to criminal defense. He was appointed to represent the petitioner in this case. Counsel said that he met with the petitioner at least four times at the prison where the petitioner was being held, as well as other times at the courthouse. Counsel received funds to hire an investigator, who also met with the petitioner at other times. Counsel felt that he had adequate time to meet with the petitioner in preparation of the case.

Counsel testified that the discovery he received from the State included an audio-taped statement of Darian Mays, which he had transcribed so the petitioner could see what Mays had said about their involvement in the homicide. Counsel recalled that he cross-examined Mays about the content of his audio statement, as well as the content of Mays's written statement that was received at trial. Counsel believed that his cross-examination of Mays was not lacking in any way.

Counsel testified that the investigator attempted to interview all of the witnesses the petitioner requested, but some would not speak to him and one was unable to be located. Counsel did not know of any witnesses they should have attempted to speak to but did not. Counsel recalled having discussions with the petitioner about the use of powder cocaine but not crack cocaine. He also recalled the petitioner talking about having smoked marijuana early in the evening of the murder, but he did not feel that any of the petitioner's disclosures regarding drug use could work to their advantage.

Counsel testified that he did not see any basis for the petitioner to seek suppression of the door to the victim's apartment and felt that the testimony elicited concerning it and the petitioner's shoes showed that it was not the petitioner who kicked in the victim's door. Counsel said that he did not feel that there was any legal basis to seek suppression of the

petitioner's coat, which was similar to the coat a witness said was worn by one of the perpetrators.

Counsel testified that he recalled that the trial court asked the parties, prior to the reading of the jury instructions, if it was acceptable that the court reporter not transcribe the jury instructions and both parties agreed that it was. He said that he had a copy of the written instructions to follow word-for-word as the trial court read them, and he did not recall the trial court misstating anything or he would have asked for a correction. Counsel did not feel that his ability to effectively represent the petitioner on appeal was affected at all due to not having a transcript of the reading of the jury instructions. Counsel said that he remained in contact with the petitioner throughout the direct appeal process and was allowed to withdraw from his representation thereafter.

On cross-examination, counsel stated that he did not recall the petitioner's having an addiction problem that would have necessitated filing a motion to obtain an addiction expert. Counsel recalled meeting with the petitioner within a couple days of trial but did not recall telling the petitioner that he was going to be convicted. However, he was sure he spoke to the petitioner about the possibility that he could get convicted if he wanted to consider making a counteroffer to the State. Counsel could not recall whether the petitioner asked him to allege prosecutorial misconduct in the motion for new trial due to the State's withholding Darian Mays's statement, and counsel did not believe there was any basis for such allegation. Counsel noted that the petitioner was precluded from the courtroom during the resentencing hearing due to his own behavior.

At the conclusion of the hearing, the post-conviction court issued oral findings, as well as a written order, denying the petition and specifically addressing the petitioner's allegations and concluding that counsel "did a fine job in this case. He is a very good attorney. He did the best he could with what he had to work with."

## ANALYSIS

On appeal, the petitioner argues that the post-conviction court erred in denying his petition because he received the ineffective assistance of counsel. The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also

-10-

applies in Tennessee). The Strickland standard is a two-prong test:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

The petitioner asserts that he received the ineffective assistance of counsel because counsel failed to "adequately prepare, interview and call witnesses[,] . . . prepare his case for [t]rial[,] . . . [or] properly investigate his addiction."[2]

With regard to the petitioner's complaint that counsel did not properly interview and call witnesses, the post-conviction court accredited counsel's testimony that he obtained funding to hire an investigator who attempted to interview all of the witnesses suggested by the petitioner as well as the State's witnesses and that all of the witnesses refused to speak to him. The court also noted that the petitioner failed to call any of the allegedly overlooked witnesses to testify at the evidentiary hearing and was therefore unable to establish

---

[2] Although the petitioner raised other allegations in his petitions, we will address only those allegations pursued on appeal.

-11-

prejudice. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We agree that the petitioner failed to demonstrate deficient performance or prejudice as to this allegation.

With regard to the petitioner's complaint that counsel failed to prepare his case for trial, counsel testified to the number and length of meetings both he and his investigator had with the petitioner, as well as his preparations for trial. The post-conviction court found that the petitioner "failed to prove the same." The court noted that counsel "is a very experienced skilled trial lawyer who not only provided effective assistance of counsel but excellent assistance. He is not to be faulted because the evidence of the [petitioner]'s guilt was overwhelming." We conclude that the petitioner has failed to prove that counsel performed deficiently in his preparation for trial.

With regard to his assertion that counsel failed to investigate his addiction, the petitioner testified that he was never asked about his drug addiction, aside from his and counsel's discussions regarding the night of the murder and what the witnesses had said about them "smoking blunts with crack on the blunts." The petitioner opined that his addiction should have been obvious to counsel because of their discussions about the petitioner "get[ting] high." Counsel recalled having discussions with the petitioner about the use of powder cocaine and about the petitioner having smoked marijuana early in the evening of the murder, but he did not feel that any of the petitioner's disclosures regarding drug use could work to their advantage. The post-conviction court found that "highlighting drug use by the [petitioner] would have been a poor trial strategy [and that], other than th[e] bare complaint by the [petitioner] there is no proof to support it." Upon review, we conclude that the petitioner failed to prove that counsel performed deficiently in making the determination that highlighting the petitioner's drug use would not work to the petitioner's advantage.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE